UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:12-CV-00129-TBR

PRO TANKS LEASING, *et al.*                                            Plaintiffs

v.

MIDWEST PROPANE AND REFINED FUELS,                     Defendants
LLC, *et al.*

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court upon Defendants Midwest Propane and Refined
Fuels LLC ("Midwest"), Innovative Energy Solutions, LLC ("Innovative"), and Grundy
Electric Cooperative, Inc.'s ("Grundy") Motion to Dismiss Plaintiffs' Complaint for
Lack of Personal Jurisdiction as to Grundy and Innovative.  (Docket No. 33.)  Plaintiffs
have responded.  (Docket No. 41.)  Defendants have replied.  (Docket No. 44.)  This
matter is now fully briefed and ripe for adjudication.  For the following reasons, the
Court will **DENY** Defendants' Motion to Dismiss Plaintiffs' Complaint for Lack of
Personal Jurisdiction.  The Court also **DENIES** Defendants' request for oral argument
on their Motion to Dismiss Plaintiffs' Complaint for Lack of Personal Jurisdiction.

**BACKGROUND**

The Court notes the facts in this case are lengthy and there is a voluminous
record including deposition testimony.  The Court has highlighted most of the pertinent
background facts.

## Claims Asserted

This action arises from an Asset Purchase Agreement ("APA") entered into by Defendant Midwest and Plaintiffs, under which the Plaintiffs essentially purchased Midwest's propane business—including assets, accounts receivables, and the Midwest name. (Docket No. 1, Page 4-5.) Plaintiffs allege that after the APA was executed they learned that a significant number of the propane tanks that were purchased "did not contain the requisite data plates and as a result contain no value," which was concealed and/or misrepresented by Defendants. *Id.* at 5. Plaintiffs also allege that Defendant knowingly provided inaccurate information regarding the receivables purchased and/or failed to provide accurate information after learning the information provided was incorrect. *Id.*

Plaintiffs bring claims for breach of contract, fraud, and an equitable action to pierce the veils of Innovative and Grundy. (Docket No. 1, Page 3.) They assert that jurisdictional discovery has revealed that Midwest was the "alter ego" of Innovative and Grundy. (Docket No. 41, Page 3.) Accordingly, Plaintiffs seek to hold Grundy and Innovative liable for the breach of contract and fraud claims. On the other hand, Defendants assert that this Court lacks personal jurisdiction over Grundy and Innovative.

**Asset Purchase Agreement**

The proceeds paid by Plaintiffs pursuant to the APA were distributed in the following manner:[1] (1) $35,000 to Grundy's construction account for two parcels which Grundy owned that Plaintiffs wanted to be part of the transaction for their office and plant;[2] and (2) the remaining proceeds went to Grundy's accounts, which according to the manager of the three entities was because Midwest was going to be dissolved shortly after the purchase because it did not own any more assets.[3]  (Docket No. 33-6, Page 56-58.)  The remaining proceeds were kept separate on Grundy's books and used to make loan payments on a note which Grundy had guaranteed for the benefit of Midwest.  *Id.* at 58.

In the APA, Midwest, Grundy, and Innovative all agreed to a non-competition and non-solicitation clause for a period of ten years.  (Docket No. 12-2, Page 26, Article 10.)  The APA also contained a provision titled "Submission to Jurisdiction" in which "[t]he parties hereto irrevocably submit to the exclusive jurisdiction of the state courts of Kentucky . . . or if jurisdiction exists to the United States District Court for the Western District of Kentucky over any dispute arising out of or relating to this Agreement."  (Docket No. 12-2, Page 28, Article 12.10.)  The parties do not appear to dispute that the "Submission to Jurisdiction" provision only applied to Midwest.

---

[1] From a review of the APA, it appears to the Court that the funds were first distributed to Midwest who then distributed them to Grundy.  (Docket No. 12-2, Page 10, Article 3.)  However, the parties appear to contend that Plaintiffs actually wired Grundy the proceeds directly.  In any event, Midwest assuredly had the power/discretion to direct Plaintiffs where to send the funds—whether or not Midwest first gained possession of the funds and then subsequently transferred them to Grundy is not determinative.

[2] A separate wire for the purchase of real estate was a requirement of Rural Utility Services.  (Docket No. 33-3, Page 4.)

[3] The remaining proceeds were as follows: $790,000 was for the assets purchased and $206,665.68 was for the accounts receivables of Midwest Propane.  (Docket No. 33-3, Page 4.)

## Overview of Entities

Grundy is a Missouri corporation and electric cooperative with its main office in Trenton, Missouri. (Docket No. 41, Page 2.) Innovative and Midwest are both Missouri LLCs also located in Trenton, Missouri. Innovative appears to have been primarily a holding company with no assets or employees. Midwest primarily sold propane and refined fuel. Grundy Electric is the sole owner of Innovative and Innovative is the sole owner of Midwest Propane and Refined Fuels LLC ("Midwest").[4] (Docket No. 33, Page 15.)

These Defendants entered into a Management and Service Agreement among themselves, whereby Grundy would provide operations and management service to Innovative and Midwest. This Management Service Agreement provided for payments from Midwest to Grundy in exchange for Grundy providing management services for Midwest. Notably, Grundy would "at times" give these payments back to Midwest due to its poor financial condition. (Docket No. 33-6, Page 63.)

Grundy Electric, Innovative, and Midwest all resided at the same business address of 4100 Oklahoma Avenue, although it appears they had separate entrances. (Docket No. 33-6, Page 10-12, 37-38.) Grundy' and Innovative have a common board of directors/ownership group, but the employees of Grundy and Midwest are not identical. (Docket No. 33-3, Number 35.) Innovative's ownership group governs Midwest. Midwest dissolved as a LLC in March 2012. (Docket No. 41-9.)

---

[4] Docket No. 41-1 provides a visual representation of the corporate structure of Grundy Electric, Innovative, and Midwest.

I. Midwest Propane and Refined Fuels, LLC

Midwest Propane was organized as an LLC in July 1999. It was created for the purpose of retail sale and delivery of propane. (Docket No. 33-3, Page 1.) After acquiring two existing propane companies in August 1999, Midwest was in continuous operation until January 28, 2011, when substantially all of its assets were sold to Plaintiffs, including its name and any variations thereof.

All of the Midwest employees were paid by Midwest. *Id.* at 41. Midwest had an operating account that was separate from Grundy Electric and it had its own website separate from Grundy and Innovative. Midwest paid its own bills during its period of operation, including insurance coverage. All customer payments for the sale of propane were directly deposited into a Midwest bank account and records were kept as to these payments.[5] Grundy employees handled Midwest billing, accounting services, customer service, consulting, and assisted in Midwest's collection efforts pursuant to the Management and Services Agreement. (Docket No. 33-6, Page 34, 40.)

Midwest typically operated at a loss—it did not regularly make money. *Id.* at 42-43. Those losses were covered through loans, which Grundy guaranteed, from the National Cooperative Service Corporation ("NCSC"), a subsidiary of Cooperative Finance Corporation ("CFC"). Grundy also donated capital to cover these losses.[6]

---

[5] There are numerous instances of Midwest appearing to adhere to corporate formalities. These include: purchasing its own equipment to operate its business, purchasing necessary business and retail licenses in its own name, paying its own taxes, having a retirement plan for its employees, and maintaining its own operation records. (Docket No. 33-4, Affidavit of Anita Osborn Accountant for Midwest Propane.)

[6] The Court notes that Grundy Electric's board of directors minutes have in the past contained resolutions that "Grundy Electric Cooperative will donate capital to each LLC in accordance with past practice." (Docket No. 33-6, Page 65.) One of those LLCs would include Midwest.

(Docket No. 33, Page 28.)  Midwest did not transfer assets or revenue in return for the guarantees or the donated capital.  *Id.*  Grundy has also guaranteed Midwest's purchase of product/their trade debt.  *Id.* at 50-52.  However, it appears Grundy never directly wrote checks for Midwest's operating expenses.

NCSC also loaned Midwest money for its startup costs.  (Docket No. 33-5, Page 31-32.)  Grundy guaranteed that loan.[7]  Software that Midwest used to manage its propane business was located at 4100 Oklahoma Avenue and was on some of the same computers used by Grundy employees.  In some instances, Midwest did not own the real estate where it operated—Grundy Electric did.

Since its formation, Midwest has either held regular monthly meetings or reported in regular monthly meetings of Innovative.  These regular monthly meetings were held separate from Grundy's meetings.  At no time did Grundy refer to Midwest as its department or division.  (Docket No. 33-3, Page 11, ¶ 80.)

II.    Innovative Energy Solutions, LLC

Innovative is a not for profit LLC organized in June 1999 as a subsidiary of Grundy Electric.[8]  "Its purpose is to further the economic, community and member services development efforts of rural electric cooperatives."  (Docket No. 33-3, Page 1.)  Innovative owns no tangible assets.  (Docket No. 33-6, Page 32.)  At monthly meetings the ownership group of Innovative would discuss the Midwest operations report and

---

[7] Midwest passed a resolution to borrow the money at an owner's group meeting.  Separately, Grundy's board of directors passed a resolution in which it agreed to guarantee the loan.  (Docket No. 33-1, Page 5.)
[8] Scott Wilson, manager of Innovative, described Innovative as "the entity that owns the subsidiaries." (Docket No. 33-6, Page 19.)  One such subsidiary was Midwest.

financial report. These meetings were held separate from Grundy Electric's monthly meetings. Innovative covered the payroll taxes and salaries of employees for Midwest, but Midwest wrote them a check to perform this apparently administrative task.[9] Innovative has never guaranteed any debts owed by Midwest. Innovative does not generate any income and does not own any assets. It does not have any employees, other than Scott Wilson who is the manager.

### III. Grundy Electric Cooperative, Inc.

Grundy Electric is a Missouri rural electric distribution cooperative incorporated in 1938 and was created by reason of the Rural Electrification Act of 1936 in order to bring electricity to rural communities. As a cooperative, it is owned by and is responsible to its members. The members elect an eight member board of directors. Grundy's board meets once a month and holds an annual membership meeting. By law, Grundy Electric can only serve its members with electric power and is not allowed to make a profit. Any profit is returned to its members. Because Grundy Electric is not required to file an income tax return, it does not receive any tax benefit from the operation of Midwest Propane. (Docket No. 33-3, Page 1.)

Scott Wilson served as a Manager for Grundy Electric, Innovative, and Midwest.[10] (Docket No. 41, Page 2; 33-6, Page 8-9, 20.) His managerial services as to Innovative and Midwest were provided under a formal Management and Services

---

[9] It appears the reason this was done was because Midwest's bank did not have Internet banking available, while Innovative's bank did. (Docket No. 33-6, Page 72-73.)

[10] Wilson actually testified that he was not "employed" by Midwest, but provided services for Midwest pursuant to a Management and Services Agreement between Grundy, Innovative, and Midwest. (Docket No. 33-6, Page 9-10.) It appears that his title at Grundy was "general manager" and his title at Innovative and Midwest was "manager." (Docket No. 33-6, Page 21.)

Agreement between Defendants. (Docket No. 33-6, Page 22.) However, he was only paid by Grundy. (Docket No. 33-6, Page 21-22.) He was not required to keep separate time sheets while doing work for Grundy or Innovative. (Docket No. 33-6, Page 14-15.)

## STANDARD

As the Court stated in its prior Order, (Docket No. 24, Page 3), the issue of personal jurisdiction largely turns on whether Midwest was the "alter ego" of Innovative and Grundy.[11] *See, e.g., Estate of Thomson ex rel. Estate of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 362 (6th Cir. 2008) (endorsing use of alter-ego theory to exercise personal jurisdiction); *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2857 (2011) (acknowledging the theory of piercing the

---

[11] The Court recognizes that there is precedent indicating that the corporate veil piercing and alter ego concepts are separate and distinct. *Bd. of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc.,* 212 F.3d 1031, 1038 (7th Cir. 2000). "In general, as the Seventh Circuit has explained, efforts to pierce the corporate veil ask a court to hold *A* vicariously liable for *B* 's debt. By contrast, a contention that *A* is *B* 's 'alter ego' asserts that *A* and *B* are *the same entity;* liability then is not vicarious but direct." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Aguirre,* 410 F.3d 297, 302 (6th Cir. 2005).

    However, the parties did not argue these concepts as separate and distinct and the case law often conflates the two concepts. In fact, in 2012 the Kentucky Supreme Court arguably held that there is no distinction between the two concepts, or at the very least no meaningful distinction:

> A successful veil-piercing claim requires both this element of domination and circumstances in which continued recognition of the corporation as a separate entity would sanction a fraud or promote injustice. The leading Kentucky case on piercing, *White v. Winchester Land Development Corp.,* 584 S.W.2d 56 (Ky.App.1979), like decisions from courts across the country, refers to this two-part test as the "alter ego" test.
>
>                \* \* \*
>
> Beyond Kentucky, veil-piercing generally focuses on the same instrumentality, alter ego and equities factors tests explored in *White*, with the alter ego formulation appearing to be the most common test, always employed in conjunction with consideration of various equities factors. The Seventh Circuit Court of Appeals, when applying Illinois law, uses the two-part alter ego test and considers the following factors under the first prong of that test

*Inter-Tel Technologies, Inc. v. Linn Station Properties, LLC,* 360 S.W.3d 152, 155, 163 (Ky. 2012). In any event, a finding that Midwest is the "alter ego" of Grundy and Innovative would be sufficient for purposes of finding personal jurisdiction.

corporate veil for jurisdictional purposes, but declining to address it because it was not previously raised). To the extent Defendants relied on *Martin ex rel. Estate of Martin v. S. Indiana Treatment Ctr., Inc.*, 2004 WL 2595946 (W.D. Ky. May 27, 2004), or *Velandra v. Regie Nationale des Usines Renault,* 336 F.2d 292, 297 (6th Cir. 1964), for the notion that the "alter ego" analysis would not be determinative as to whether the Court has personal jurisdiction over Grundy and Innovative, their reading of these cases is not consistent with more recent Sixth Circuit precedent. In *Velandra* the Sixth Circuit stated:

> The ownership of the subsidiary carrying on local activities in Michigan represents merely one contact or factor to be considered in assessing the existence or non-existence of the requisite minimum contacts with the State of Michigan, but is not sufficient of itself to hold the present corporations amenable to personal jurisdiction.

*Velandra,* 336 F.2d at 297. Plaintiffs do not assert the Court has personal jurisdiction over Innovative and Grundy merely because of their *ownership* of Midwest. On the contrary, they assert personal jurisdiction based on piercing of the corporate veil and alter ego doctrines. Essentially, they allege Grundy and Innovative exercise "undue control" or are the "alter egos" of Midwest. Accordingly, the above statement from *Velandra* does not resolve Plaintiffs' claims. However, another portion of the opinion is related:

> Considering first the chain of corporate ownership, Regie owns 100% of the stock of Renault, and Renault in turn owns 100% of the stock of Great Lakes, which, as indicated, carries on substantial economic activities within the State of Michigan. **However, the mere ownership by a corporation of all of the stock of a subsidiary amenable to the jurisdiction of the courts of a state may not alone be sufficient to justify holding the parent**

**corporation likewise amenable.** In the early case of *Cannon Mfg. Co. v. Cudahy Packing Co.*, the Supreme Court held that the activities of a subsidiary did not subject its parent corporation to the personal jurisdiction of local courts.

It should be noted that the ruling of the Cannon case, if not qualified by the subsequent ruling in the International Shoe Company case, has been at least qualified in later cases holding foreign corporations amenable to the personal jurisdiction of local courts because of the local activities of subsidiary corporations upon the theory that the corporate separation is fictitious, or that the parent has held the subsidiary out as its agent, or, more vaguely, that the parent has exercised an undue degree of control over the subsidiary.

**Unfortunately, such reasoning in these and similar cases, fails to explain the decisions of the courts adequately.** Thus the law relating to the fictions of agency and of separate corporate entity was developed for purposes other than determining amenability to personal jurisdiction, **and the law of such amenability is merely confused by reference to these inapposite matter.**

*Velandra,* 336 F.2d 292, 296-97 (6th Cir. 1964) (emphasis added). Admittedly, although this Court would not do so, this portion of the opinion could be read to render the "alter ego" determination separate from the determination of whether the Court possesses personal jurisdiction over the parents whose veil was pierced. In fact, an unpublished Western District of Kentucky case, in dicta, appears to have interpreted this statement that way:

*Velandra* points out that *Cannon Mfg. Co. v. Cudahy Packing Co.,* 267 U.S. 333 (1925), the original case that held the activities of a subsidiary did not subject a parent corporation to the personal jurisdiction of local courts, was later qualified by cases following *International Shoe* and the minimum contacts analysis. 336 F.2d at 296. These qualifying cases held that foreign corporations are amenable to personal jurisdiction of local courts solely because of the activities of subsidiary corporations under the theory that the corporate separation was fictitious, *Intermountain Ford Tractor Sales Co. v. Massey–Ferguson Ltd,* 210 F.Supp. 930 (C.D. Utah 1962), or that the parent held the subsidiary out as its agent, *Curtis*

> *Publishing Co. v. Cassel,* 302 F.2d 132 (10th Cir. 1962), or that the parent exercised an undue degree of control over the subsidiary, *Focht v. Southwestern Skyways, Inc.,* 220 F.Supp. 441 (Colo. 1963). ***Velandra* points out that the law relating to the fictions of agency and of separate corporate entity was developed for purposes other than determining the amenability to personal jurisdiction, and therefore the law of amenability is confused by reference to these inapposite matters.** 336 F.2d at 297. Therefore, the *Velandra* court came to the common sense solution that the question goes back to whether the *parent* has the minimum contacts, and that a subsidiary carries on local activities is merely one factor to be considered in assessing whether or not the parent has the requisite contacts with a state. *Id.* (emphasis added.)
>
> Plaintiff alleges a fictitious corporate separation between National and SITC, but the record contains no evidence whatsoever that would justify a finding of an alter ego, and therefore the piercing of corporate veils, or the disregarding of corporate entities. **However, the *Velandra* holding proves that the alter ego, or undue degree of control analysis, is actually irrelevant to whether National has minimum contacts with Kentucky.**

*Martin ex rel. Estate of Martin v. S. Indiana Treatment Ctr., Inc.,* 2004 WL 2595946, at *3 n. 3 (W.D. Ky. May 27, 2004) (emphasis added). This Court would not read *Velandra* so broadly. It appears that *Velandra* may have merely been criticizing the frequency in which Courts would assert "alter ego" or "lack of corporate separateness" as justifications for finding personal jurisdiction when the circumstances for a true corporate veil piercing remedy were not applicable.

This Court believes when the unique circumstances for a corporate veil piercing and/or alter ego determination are met the proper question is not whether the parent has minimum contacts with a jurisdiction. To the contrary, the proper question is whether the parent *and/or* the subsidiary have minimum contacts, because the parent is essentially one in the same with the subsidiary—it is its "alter ego." However, when the circumstances do not merit piercing of the corporate veil, it is well established that

the question is whether the *parent* itself has the minimum contacts with the state. *Velandra,* 336 F.2d at 297. Ownership of the subsidiary—when there is no piercing of the corporate veil involved—is considered one contact in the analysis, but that relationship alone does not decide the personal jurisdiction question. *Id.* In any event, to the extent *Martin* or *Velandra* could be read to hold or imply otherwise, it is inconsistent with more recent precedent from the Sixth Circuit:

> This argument raises a critical point in the jurisdictional analysis: the extent to which a parent corporation is subject to general jurisdiction based on activities of a subsidiary.
>
> As one of our sister Circuits has explained:
>> federal courts have consistently acknowledged that it is **compatible with due process** for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court **when the individual or corporation is an alter ego** or successor of **a corporation that would be subject to personal jurisdiction in that court.**
>
> *Patin v. Thoroughbred Power Boats Inc.,* 294 F.3d 640, 653 (5th Cir. 2002) (collecting cases). Normally, courts apply the alter-ego theory of personal jurisdiction to parent-subsidiary relationships. **The alter-ego theory of personal jurisdiction, in the parent-subsidiary context, provides that "a non-resident parent corporation is amenable to suit in the forum state if the parent company exerts so much control over the subsidiary that the two do not exist as separate entities but are one and the same for purposes of jurisdiction."** *Danton v. Innovative Gaming Corp.,* 246 F.Supp.2d 64, 72 (D. Me. 2003).
>
> **Courts in this Circuit, in several unpublished opinions, have endorsed the use of the alter-ego theory to exercise personal jurisdiction.** *See Flynn v. Greg Anthony Constr. Co.,* 95 Fed. App'x. 726, 736–38 (6th Cir. 2003); *Niemi v. NHK Spring Co. Ltd.,* No. 3:03 CV 7512, 2006 WL 954248, at *1 (N.D. Ohio Apr. 12, 2006); *Simsa v. Gehring L.P.,* No. 05 CV 72159, 2006 WL 467914, at *4 (E.D. Mich. Feb. 24, 2006); *Bradford Co. v. Afco Mfg.,* No. 1:05 CV 449, 2006 WL 143343, at *4 (S.D. Ohio Jan.19,

2006); *Invacare Corp. v. Sunrise Med. Holdings, Inc.,* No. 1:04
CV 1439, 2004 WL 3403352, at *7–8 (N.D. Ohio Dec. 15, 2004);
*Med. Distrib., Inc. v. Quest Healthcare, Inc.*, No. 3:00 CV 154,
2002 WL 32398447, *4–*5 (W.D. Ky. Feb. 1, 2002); *see also
Warren v. Dynamics Health Equip. Mfg. Co.*, 483 F.Supp. 788,
792–93 (M.D. Tenn. 1980). These cases are in line with other
federal cases permitting courts "to 'pierce the corporate veil' of the
subsidiary and **impute personal jurisdiction from the subsidiary
to the parent.**" *Invacare Corp.,* 2004 WL 3403352, at *7.

> **In applying the alter-ego theory of personal jurisdiction in this
> diversity action,** we must look to Ohio law.

*Estate of Thomson ex rel. Estate of Rakestraw v. Toyota Motor Corp. Worldwide*, 545

F.3d 357, 362 (6th Cir. 2008) (emphasis added).

It is undisputed that this Court has personal jurisdiction over Midwest.

Accordingly, if Midwest is the "alter ego" of Innovative and Grundy then the Court will

have personal jurisdiction over Innovative and Grundy.

## Law Applicable For Determination of Corporate Veil Piercing

Defendants assert that Missouri law, as the state of incorporation of Grundy and

Innovative, must be analyzed to determine if their veils should be pierced. (Docket No.

33, Page 16.) On other hand, Plaintiffs argue that Kentucky law applies. (Docket No.

41, Page 3.) In Plaintiffs' response they argue the Sixth Circuit has previously decided

this issue:

> Under the long-standing *Erie* doctrine, in actions brought in federal
> court invoking diversity jurisdiction, a court must apply the same
> substantive law as would have been applied if the action had been
> brought in a state court of the jurisdiction where the federal court is
> located. **When the success of a state law claim brought in
> federal court under diversity jurisdiction is dependent on
> piercing the corporate veil, this question of substantive law is
> governed by the law of the state in which the federal court sits.**

> In this case, all the claims brought by the plaintiffs-fraud, breach of contract, promissory estoppel, and age discrimination-are governed by state law. Therefore, the district court, sitting in Ohio, properly applied the State of Ohio's piercing law. (emphasis added.)

*Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 723 (6th Cir. 2007) (citations omitted.)

Defendants did not address this argument in their reply brief.[12] (Docket No. 44.) The Court agrees with Plaintiffs that the Sixth Circuit has decided this issue.[13]

In this case, Plaintiffs have brought only state law claims under diversity jurisdiction and their success against some Defendants, Grundy Electric and Innovative, is dependent on piercing the corporate veil. Accordingly, the question of substantive law—specifically corporate veil piercing law—is governed by the law of the state in which this Court sits: Kentucky.[14]

## Kentucky's Corporate Veil Piercing Standard

"A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003). "A corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary; and, it follows with even greater force, the parent does not own or have legal title to the subsidiaries of the subsidiary." *Id.* Further,

> [I]t is hornbook law that the exercise of the 'control' which stock ownership gives to the stockholders . . . will not create liability beyond the assets of the subsidiary. That 'control' includes the

---

[12] The Court notes Defendants appear to implicitly agree that Kentucky law would apply as their reply brief focuses exclusively on the corporate veil piercing standard under Kentucky law. (Docket No. 44, Page 2.)

[13] In any event, the Court finds the minor differences between Missouri and Kentucky law would not change the ultimate outcome.

[14] The Court notes that, as in *Corrigan*, the "plaintiffs brought only state law claims" so a federal veil-piercing standard does not apply. *Corrigan*, 478 F.3d at 724.

election of directors, the making of by-laws . . . and the doing of all other acts incident to the legal status of stockholders.  Nor will a duplication of some or all of the directors or executive officers be fatal.

*U.S. v. Bestfoods*, 524 U.S. 51, 61-62 (1998).  However,

> [T]here is an equally fundamental principle of corporate law, applicable to the parent-subsidiary relationship as well as generally, that the corporate veil may be pierced and the shareholder held liable for the corporation's conduct when, inter alia, the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the shareholder's behalf.

*Bestfoods*, 524 U.S. at 62-63.

"The burden of proof to demonstrate grounds for piercing the corporate veil is on the party seeking to impose liability on the parent corporation."  *Corrigan*, 478 F.3d at 724.  As discussed above, the substantive law governing corporate veil piercing/alter ego issues in this case is Kentucky's law.  Recently, the Kentucky Supreme Court has explained the equitable doctrine of piercing the corporate veil:

> Piercing the corporate veil is an equitable doctrine invoked by courts to allow a creditor recourse against the shareholders of a corporation.  In short, the limited liability which is the hallmark of a corporation is disregarded and the debt of the pierced entity becomes enforceable against those who have exercised dominion over the corporation to the point that it has no real separate existence.  A successful veil-piercing claim requires both this element of domination and circumstances in which continued recognition of the corporation as a separate entity would sanction a fraud or promote injustice.

*Inter-Tel Technologies, Inc. v. Linn Station Props., LLC*, 360 S.W.3d 152, 155 (Ky. 2012).  Thus, to pierce a corporate veil a court must find two separate elements: "(1) domination of the corporation resulting in a loss of corporate separateness *and* (2)

circumstances under which continued recognition of the corporation would sanction fraud or promote injustice."[15]  *Id.* at 165.  In deciding whether to pierce a corporate veil, the Kentucky Supreme Court assembled two lists of factors that should be considered by courts when assessing corporate separateness:

> (1) inadequate capitalization;
> (2) failure to issue stock;
> (3) failure to observe corporate formalities;
> (4) nonpayment of dividends;
> (5) insolvency of the debtor corporation;
> (6) nonfunctioning of the other officers or directors;
> (7) absence of corporate records;
> (8) commingling of funds;
> (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors;
> (10) failure to maintain arm's-length relationships among related entities; and
> (11) whether, in fact, the corporation is a mere façade for the operation of the dominant stockholders.
>
> a)  Does the parent own all or most of the stock of the subsidiary?
> b)  Do the parent and subsidiary corporations have common directors or officers?
> c)  Does the parent corporation finance the subsidiary?
> d)  Did the parent corporation subscribe to all of the capital stock of the subsidiary or otherwise cause its incorporation?
> e)  Does the subsidiary have grossly inadequate capital?
> f)  Does the parent pay the salaries and other expenses or losses of the subsidiary?
> g)  Does the subsidiary do no business except with the parent or does the subsidiary have no assets except those conveyed to it by the parent?
> h)  Is the subsidiary described by the parent (in papers or statements) as a department or division of the parent or is the business or financial responsibility of the subsidiary referred to as the parent corporation's own?
> i)  Does the parent use the property of the subsidiary as its own?

---

[15] The Court notes there are technically three basic approaches to veil-piercing: the instrumentality theory, the alter ego theory, and the equity formulation.  *Inter-Tel*, 360 S.W.3d at 161.  However, as the Kentucky Supreme Court noted in *Inter-Tel*, these three theories are for the most part interchangeable.  *See, e.g., CNH Capital Am. LLC v. Hunt Tractor, Inc.*, 3:10-CV-350, 2013 WL 1310878, at *17 (W.D. Ky. Mar. 26, 2013).

j) Do the directors or executives fail to act independently in the interest of the subsidiary, and do they instead take orders from the parent, and act in the parent's interest?

k) Are the formal legal requirements of the subsidiary not observed?

*Inter-Tel*, 360 S.W.3d at 163-64. The Court emphasized the most critical factors were "grossly inadequate capitalization, egregious failure to observe legal formalities and disregard of distinctions between parent and subsidiary, and a high degree of control by the parent over the subsidiary's operations and decisions, particularly those of a day-to-day nature." *Id.* at 164.

## DISCUSSION

### **Application of Standard to Current Case**

It appears Plaintiffs would concede that standing alone—without reference to Midwest—this Court would not have personal jurisdiction as to Innovative and Grundy Electric. Plaintiffs' entire basis for this Court to have personal jurisdiction over Innovative and Grundy is Midwest is their "alter ego." Defendants have stipulated that Midwest is subject to this Court's jurisdiction.

Defendants argue that all Plaintiffs allege is that there is unity of ownership and interest among Defendants, which isn't sufficient to result in corporate veil piercing and/or an identity of corporate interest. (Docket No. 33, Page 38.) Specifically, Defendants state that Plaintiffs' argument essentially amounts to the notion that because Grundy Electric was the sole member of Innovative and Innovative was the sole member of Midwest there must be something inherently wrong with that. Defendants

argue they have not pled any kind of misconduct by either Grundy or Innovative or how they would be damaged because of this alleged improper corporate structure.

Because the record is long and the parties' have made numerous arguments, the Court will go through each of the individual factors from *Inter-Tel*, considering the relevant evidence in the record and addressing the parties' arguments. The Court reiterates that to pierce a corporate veil and/or find an entity is an alter ego two separate elements must be shown: "(1) domination of the corporation resulting in a loss of corporate separateness *and* (2) circumstances under which continued recognition of the corporation would sanction fraud or promote injustice."[16] *Inter-Tel*, 360 S.W.3d at 165. In analyzing the first element, the most critical factors are: "grossly inadequate capitalization, egregious failure to observe legal formalities and disregard of distinctions between parent and subsidiary, and a high degree of control by the parent over the subsidiary's operations and decisions, particularly those of a day-to-day nature." *Id.* at 164.

I. First Element – Domination of the Corporation Resulting in a Loss of Corporate Separateness

As previously stated, for a determination of whether there is a domination of the corporation resulting in a loss of corporate separateness, the Kentucky Supreme Court instructs courts to look at a list of eleven factors: (a) – (k). The Court will address each factor in turn.

---

[16] The Court notes there are technically three basic approaches to veil-piercing: the instrumentality theory, the alter ego theory, and the equity formulation. *Inter-Tel*, 360 S.W.3d at 161. However, as the Kentucky Supreme Court noted in *Inter-Tel*, these three theories are for the most part interchangeable. *See, e.g., CNH Capital Am. LLC v. Hunt Tractor, Inc.*, 3:10-CV-350, 2013 WL 1310878, at *17 (W.D. Ky. Mar. 26, 2013).

### a) Does the parent own all or most of the stock of the subsidiary?

Defendants argued this factor does not apply as there is no stock issued by the entities. (*See* Docket No. 44, Page 9.) However, the Court notes it is undisputed that Grundy is the sole owner of Innovative and Innovative is the sole owner of Midwest. Therefore, applying a similar rationale that is inherent in (a)—the notion that sole ownership is in favor of finding domination—this sole ownership by Grundy supports a finding of domination of the corporation resulting in a loss of corporate separateness. Courts treat limited liability companies the same as corporations for purposes of liability analysis. *See, e.g., Dzurilla v. All Am. Homes, LLC*, 2010 WL 55923, at *3 (E.D. Ky. Jan. 4, 2010). Accordingly, the Court finds this factor is in favor of finding domination of the corporation resulting in a loss of corporate separateness.

### b) Do the parent and subsidiary corporations have common directors or officers?

The entities have at least one common officer—manager Scott Wilson. It also appears the board of directors/ownership groups are the same for Grundy, Innovative, and Midwest.[17] The Court notes Defendants do not appear to dispute that this factor would be in favor of finding a lack of corporate separateness, merely arguing that alone it is not determinative. (Docket No. 44, Page 9-10.) Therefore, this factor is in favor of finding domination of Midwest resulting in a loss of corporate separateness.

---

[17] Grundy owns all of the ownership in Innovative. Grundy's board of directors also serves as Innovative's "ownership group." Midwest is governed by Innovative's ownership group, which are the same individuals that serve on Grundy's board of directors.

### c) Does the parent corporation finance the subsidiary?

While admittedly Midwest adhered to corporate formalities in that it paid its own bills, maintained its own bank accounts, and held its own assets—apart from the real estate owned by Grundy—the Court finds it is apparent that Grundy essentially financed Midwest's operation. Grundy guaranteed the loan which was used to fund Midwest's startup costs. Subsequently, Midwest was unprofitable and lost money in every year of operation except one. These losses were covered by lenders whose loans were guaranteed by Grundy Electric. Grundy also donated capital numerous times to Midwest, including $70,000 in 2005.[18]

Grundy received nothing in return for guaranteeing these loans or donating capital. Although Defendants appear to argue there was some notion that this capital would be paid back when/if Midwest became profitable, there was nothing recorded that indicated a payment schedule, the date at which payment could be expected, or the interest that would accrue on the "debt." Grundy also guaranteed Midwest's trade debts, with one example being a guarantee to SemStream. Grundy would also often pay back to Midwest the management fees Midwest would pay to Grundy under the Management and Services Agreement. Finally, Grundy owned real estate on which Midwest operated. Therefore, this factor is in favor of finding domination of Midwest resulting in a loss of corporate separateness.

---

[18] This was documented in Grundy's June 29, 2005, board meeting minutes.

**d)  Did the parent corporation subscribe to all of the capital stock of the subsidiary or otherwise cause its incorporation?**

Defendant argues this factor does not apply as there is no stock issued by the entities.  (*See* Docket No. 44, Page 9.)  However, the Court notes Grundy guaranteed the loan which covered the startup costs for Midwest.  Therefore, Grundy would have "caused its incorporation."  Accordingly, the Court finds that this factor supports a finding of domination of the corporation resulting in a loss of corporate separateness.

**e)  Does the subsidiary have grossly inadequate capital?**

The Court notes this is one of the most critical factors.  *Inter-Tel*, 360 S.W.3d at 164.  The *Inter-Tel* Court stated the "consideration of the adequacy of capitalization concerns the financing of the corporation, not its condition at the time of the events complained of or thereafter."  *Id.* at 167 (citing *Anderson v. Abbott*, 321 U.S. 349, 362 (1944)).  Thus, the undercapitalization inquiry focuses on whether or not Midwest was undercapitalized at the *time of the initial financing*.

The Court notes the parties dispute whether Midwest's initial capitalization was adequate.  Defendants argue that Midwest was adequately capitalized because at its inception it received loans totaling $3.7 million dollars from NCSC to acquire two ongoing propane businesses.  (Docket No. 44, Defendants' Reply Brief, Page 4.) Defendants state that:

> [t]his amount was more than what was needed and the full amount was never borrowed.  The amount that was borrowed covered the reasonably anticipated liabilities measured against the nature and magnitude of its understanding of the risk attendant to the propane business keeping in mind that Midwest Propane was purchasing

> two ongoing companies with a ready list of customers and the route drivers were going to become employees of Midwest Propane.

(Docket No. 44, Defendant's Reply Brief, Page 4-5.) On the other hand, Plaintiffs argue Midwest was inadequately capitalized by pointing out that Midwest was not profitable, Grundy guaranteed loans to Midwest during its operation, and Grundy donated capital to Midwest during its operation. However, none of these facts are determinative as to the core inquiry of whether Midwest's *initial* capitalization was adequate.

"Subsequent economic developments that weaken the debtor's financial condition, even those leading to insolvency, are irrelevant for [the determination of whether undercapitalization exists] if the corporation was adequately financed at the outset." *Intel-Tel*, 360 S.W.3d at 167. Defendant has alleged that market conditions occurring shortly after the purchase of two propane businesses created an unfavorable market climate from which Midwest could never recover. (Docket No. 44, Page 4.) Essentially, Defendants assert that the initial capitalization was adequate, notwithstanding subsequent events and "contributions/financing" by Grundy. Plaintiffs have focused solely on the *subsequent* need of capital Midwest required. *Inter-Tel* makes clear these subsequent events are not determinative. *Intel-Tel*, 360 S.W.3d at 167. Accordingly, given the lack of any evidence indicating the initial capitalization was inadequate—the Court finds that the *initial* capitalization of Midwest appears to have been adequate. The fact that subsequent events caused Midwest to be

unprofitable, requiring additional contributions/guarantees by Grundy, is not determinative as to the *initial* adequacy of the capitalization.[19]

However, there are two exceptions delineated in *Inter-Tel* to the general rule that the capitalization at the inception is what controls. First, "[w]hen the inadequacy of capitalization arises after commencement of the business, as a result of capital transfers to the controlling shareholder, it may be taken into account; the withdrawal renders the initial inadequacy irrelevant." *Inter-Tel*, 360 S.W.3d at 167. Second, "when the corporation substantially expands its size or the nature of its business, its capital requirements change, and there may be undercapitalization of the new business despite any additional infusion of capital." *Id.* There is no indication that the second exception would be applicable under these circumstances. However, the Court finds the first exception is applicable.

The Court notes Plaintiffs did not explicitly discuss the first exception, as it was first mentioned in Defendants' reply brief. (Docket No. 44, Page 5.) However, implicitly Plaintiffs argued for such an exception by emphasizing that the "proceeds of the sale of Midwest went directly into Grundy's financial account." (Docket No. 41, Page 8.) While Defendants argue there "have been NO capital transfers from Midwest Propane to Grundy Electric," the proceeds of the asset purchase being transferred to

---

[19] At least one other court has found that fact that members were forced to later finance significant company expenses to keep the company afloat was indicative of inadequate initial capitalization. *See Tyson Fresh Meats, Inc. v. Lauer Ltd., L.L.C.*, 918 F. Supp. 2d 835, 851-52 (N.D. Iowa 2013). However, in *Tyson*, the Court apparently found support for the notion that, apart from this subsequent financing, the initial capitalization appeared inadequate. *Id.* In this case, Midwest purchased two existing propane businesses and there is no indication its startup loan was not sufficient.

Grundy's accounts, rather than Midwest's, is such a transfer.[20] As in *Inter-Tel*, where "transfers of any and all operating capital that ITS previously possessed to Inter-Tel resulted in undercapitalization at the times relevant to this litigation, regardless of the initial capitalization when ITS was independently incorporated years before the Inter-Tel group purchased it," this transfer left Midwest with no assets, notwithstanding the fact the initial capitalization may have been adequate.[21] *Id.* at 167. As a result, "the inadequacy of capitalization" would have arisen "after commencement of the business, as a result of capital transfers to the controlling shareholder." *Inter-Tel*, 360 S.W.3d at 167. Courts treat limited liability companies the same as corporations for purposes of liability analysis. *See, e.g., Dzurilla v. All Am. Homes, LLC*, 2010 WL 55923, at *3 (E.D. Ky. Jan. 4, 2010); *Daniels v. CDB Bell, LLC*, 300 S.W.3d 204 (Ky. Ct. App. 2009); *Hodak v. Madison Capital Management, LLC*, 2009 WL 2903587 (6th Cir. 2009); *Skyway USA, Inc. v. Synergistic Communications, LLC*, 2008 WL 4000560 (W.D. Ky. 2008); *First Construction, LLC v. Gravelroad Entertainment, LLC*, 2008 WL 2038878, *1 (E.D. Ky. 2008); *see also Kaycee Land and Livestock v. Flahive*, 46 P.3d 323, 327–328 (Wyo. 2002) ("We can discern no reason, in either law or policy, to treat LLCs differently than we treat corporations.... Most, if not all, of the expert LLC commentators have concluded the doctrine of piercing the veil should apply to LLCs.").

---

[20] The Court again notes that a review of the APA makes it appear as if the funds were first distributed to Midwest who then distributed them to Grundy. (Docket No. 12-2, Page 10, Article 3.) However, the parties appear to contend that Plaintiffs actually wired Grundy the proceeds directly. In any event, Midwest assuredly had the power/discretion to direct Plaintiffs where to send the funds—whether or not Midwest first gained possession of the funds and then subsequently transferred them to Grundy is not determinative.

[21] As a sidenote, the Court believes "it strains credibility to suggest an independently-operated corporation would have made the kind of deal that [Midwest] made," essentially selling all of its assets and giving all of the proceeds to Grundy. *Louisville/Jefferson Cnty. Metro Gov't v. Hornblower Marine Servs.-Kentucky, Inc.*, 3:06-CV-348-S, 2009 WL 3231293, at *7 (W.D. Ky. Oct. 2, 2009).

Accordingly, the Court finds that Midwest did have grossly inadequate capital. This factor cuts in favor of finding domination and a lack of corporate separateness.[22]

---

[22] Relatedly, courts have noted that a diversion by owners of an entity's funds or assets for their own use using the dissolution process is a significant factor in favor of piercing the corporate veil. One such court stated:

> However, **it is a general principle of corporate law that owners of an insolvent entity "cannot participate in" even the legitimate "distribution of its assets until the claims of creditors are paid."**
>
> As stated in the Encyclopedia of the Law of Private Corporations:
>
>> If the assets or capital [of an entity] are distributed to stockholders, either directly or *indirectly,* or if the stockholders are allowed to withdraw assets leaving creditors unpaid, they may be compelled to repay what they have received, at the suit of creditors . . . at least to the extent necessary to realize the ratable liability of each stockholder for corporate debts, if the company has not retained sufficient assets to pay its debts.
>
> **While Plaintiff was not, strictly speaking, a creditor of Lauer Limited, Lauer Limited did, upon signing the Contracts, have an obligation to Plaintiff.** Instead of fulfilling that obligation, Lauer Limited's members consciously decided to fulfill all of its other obligations to the exclusion of Plaintiff. **Some of the obligations the members decided to make good on resulted in payments to individual members and other entities of which some of the members were part owners, resulting in both direct and indirect distributions to the members, while Tyson was left out in the cold.** Thus, the members of Lauer Limited, though they did not usurp Lauer Limited's assets or property by ignoring separateness of Lauer Limited, **did use the dissolution process as an end around to divert what company funds were available to themselves and other entities of which they were part owners.**

*Tyson*, 918 F. Supp. 2d 835, 854 (N.D. Iowa 2013) (citations omitted)(emphasis added). Otherwise, entities would be free to "use the dissolution process as an end around to divert what company funds were available to themselves and other entities of which they were part owners." *Id.*

There are similar rationales upon which the same result could be reached. "The separate entity concept of an entity may be disregarded where the entity is a mere shell serving no legitimate business purpose, and is used as an intermediary to perpetuate fraud on the creditors." *Tyson*, 918 F. Supp. 2d 835, 854 (N.D. Iowa 2013) (citing *Christian v. Smith*, 759 N.W.2d 447, 463 (2008)). Additionally, "the general rule holds that that if a shareholder receives property from a dissolved corporation, that shareholder is liable to any unpaid creditors of the dissolved corporation to the extent of the property received." *Bear, Inc. v. Smith*, 303 S.W.3d 137, 146 (Ky. Ct. App. 2010).

Surprisingly, it does not appear Kentucky courts have squarely addressed the issue of the impact the use of the dissolution process to arguably divert funds to owners of the entity has on the first prong of the inquiry—whether the domination of the corporation resulted in a loss of corporate separateness. *See Morgan v. O'Neil*, 652 S.W.2d 83, 85 (Ky. 1983). *Morgan* involved a similar situation with a sole shareholder who decided to dissolve a corporation with knowledge of Plaintiffs' claim. However, in that case, the Kentucky Supreme Court did not actually address the issue, instead finding Plaintiff failed to specifically state a piercing claim in his complaint. Notably, *Inter-Tel* referred to such acts by the sole shareholder as "questionable." *Inter-Tel*, 360 S.W.3d at 162.

In any event, it appears in this case the transfer of assets to Grundy occurred *prior* to the actual dissolution of Midwest. To stay consistent with the framework established by the Kentucky Supreme Court in *Inter-Tel* and not unnecessarily complicate matters, the Court will view the transfer of all of the proceeds

**f) Does the parent pay the salaries and other expenses or losses of the subsidiary?**

Grundy does not directly pay the salaries and other expenses/losses of Midwest. Midwest hires its own employees and paid their salaries and benefits on its own. Grundy did not directly pay for Midwest's insurance, propane inventory, taxes, or other expenses. Nor did Grundy authorize these payments by Midwest. Therefore, this factor is not in favor of finding domination and a lack of corporate separateness

**g) Does the subsidiary do no business except with the parent or does the subsidiary have no assets except those conveyed to it by the parent?**

Midwest purchased its own equipment to operate its business. It did not lease or purchase assets from Grundy. While it appears that Grundy permitted Midwest to use two parcels of Grundy's real estate for their operations, there is no indication these parcels were ever conveyed to Midwest. Most of Midwest's business was with entities other than Grundy. Therefore, this factor is either neutral or marginally in favor of not finding domination and a lack of corporate separateness.

**h) Is the subsidiary described by the parent (in papers or statements) as a department or division of the parent or is the business or financial responsibility of the subsidiary referred to as the parent corporation's own?**

Defendants contend they have never referred to Midwest as a department or division of Grundy or Innovative. Plaintiffs have not disputed this contention. Therefore, this factor is in favor of not finding domination and a lack of corporate separateness.

---

from the Asset Purchase Agreement to Grundy as fitting within the first exception to the general rule that capitalization at inception is what controls, despite the fact the Midwest subsequently dissolved.

### i) Does the parent use the property of the subsidiary as its own?

It appears assets of Midwest were used in the operation of its propane business and not utilized by Grundy electric. Therefore, this factor is in favor of not finding domination and a lack of corporate separateness.

### j) Do the directors or executives fail to act independently in the interest of the subsidiary, and do they instead take orders from the parent, and act in the parent's interest?

Grundy owns all of the ownership in Innovative. Grundy's board of directors also serves as Innovative's "ownership group." Midwest is governed by Innovative's ownership group, which are the same individuals that serve on Grundy's board of directors. This conceivably could form the basis for the claim that the "directors" of Midwest fail to act independently in the interest of Midwest or that they take orders from Grundy Electric.[23]

The choice to transfer all proceeds from Plaintiffs' pursuant to the APA to Grundy would not be in Midwest's interest and be entirely in Grundy's interest. Paired with the control Grundy possesses over Midwest through Innovative's ownership group—who are the same individuals serving on Grundy's board of directors—demonstrates a failure of Midwest to act independently in its own interest. Accordingly, this factor is in favor of finding domination and a lack of corporate separateness.

---

[23] Notably, the 1999 Amended Operating Agreement of Midwest requires that "any extraordinary, unusual or other decisions concerning the business affairs of the company" are made my Midwest, "subject, however, to the obtaining of the advice and consent of the Board of Directors of Grundy Electric Cooperative, Inc." (Docket No. 42-5.)

**k) Are the formal legal requirements of the subsidiary not observed?**

It appears the formal legal requirements of Midwest are observed, including monthly operational meetings, maintenance of operation and financial records, and filing of their own taxes.  Therefore, this factor weighs against finding domination and lack of corporate separateness.

II.  Considering the "Critical" Factors as to the First Element

The *Intel-Tel* Court emphasized the most critical factors in analyzing the first element—domination and lack of corporate separateness—were (1) grossly inadequate capitalization; (2) egregious failure to observe legal formalities and disregard of distinctions between parent and subsidiary; and (3) a high degree of control by the parent over the subsidiary's operations and decisions, particularly those of a day-to-day nature."  *Id.* at 164; *see also Tully v. Eaton Corp.*, 2013 WL 4460272, at *5-6 (E.D. Ky. Aug. 16, 2013).

a.  Grossly Inadequate Capitalization

For the reasons discussed above, the Court finds that this critical factor is in favor of finding a lack of corporate separateness because of the domination of Midwest.

b.  Egregious Failure to Observe Legal Formalities and Disregard of Distinctions Between Parent and Subsidiary

In some instances legal formalities were not observed and distinctions between the entities were disregarded: Grundy permitted Midwest to use two parcels of real estate apparently for free and not pursuant to an agreement, Scott Wilson was the manager for all entities, the board of directors/ownership groups for all entities was the

same, and all the entities resided at the same address.  However, other than these instances, it appears Midwest and Grundy Electric observed legal formalities and distinctions between the entities were not disregarded.  Accordingly, the Court finds this critical factor weighs slightly against a finding domination and a lack of corporate separateness.

     c.   <u>High Degree of Control by the Parent Over the Subsidiary's Operations and Decisions, Particularly Those of a Day-to-Day Nature</u>

Grundy owns all of the ownership in Innovative.  Grundy's board of directors also serves as Innovative's "ownership group."  Midwest is governed by Innovative's ownership group, which are the same individuals that serve on Grundy's board of directors.  At the very least, this creates the possibility of a high degree of control by Grundy exists as to Midwest.

Notably, the 1999 Amended Operating Agreement of Midwest requires that "any extraordinary, unusual or other decisions concerning the business affairs of the company" are made my Midwest, "subject, however, to the obtaining of the advice and consent of the Board of Directors of Grundy Electric Cooperative, Inc."  (Docket No. 42-5.)  However, "ordinary and usual decisions concerning the daily business affairs" are still made by Midwest.  *Id.*  Although, Scott Wilson testified that the operation of Midwest did not reflect the terms of the operating agreement in that the advice and consent of the board of directors of Grundy was not sought with respect to extraordinary and unusual business decisions, the document does reflect an intention that Grundy maintain significant control over Midwest.  Scott Wilson also testified that Midwest's management decisions were actually governed by Innovative's owner group—who

were the very same people who acted as Grundy's board of directors. Furthermore, the decision to transfer all of the proceeds from the APA to Grundy could only logically have been a result of the high degree of control exerted by Grundy over Midwest. Accordingly, the Court finds that Grundy was exercising a high degree of control over Midwest.[24] Therefore, this factor is in favor of finding a lack of corporate separateness because of the domination of Midwest.[25]

### III. Conclusion on First Element Based on Consideration of All Factors

Admittedly, this is a closer case than *Inter-Tel* which was "a clear example of circumstances under which entitlement to the privilege of separate corporate existence should be forfeited." *Inter-Tel*, 360 S.W.3d at 152. In that case, all delineated factors except one cut in favor of finding a lack of corporate separateness. Distinct from *Inter-Tel*, in this case it appears that Midwest, Grundy, and Innovative observed many standard corporate formalities and processes. However, that alone is not determinative. Here a corporation possessed great—if not total—control over an entity, guaranteed all loans to said entity, regularly donated capital to the entity, permitted the entity to use its real estate, and had the entity transfer all of its remaining capital it received as a result of a sale of its assets—leaving it grossly undercapitalized. Notably, "it strains credibility to suggest an independently-operated corporation would have made the kind of deal that [Midwest] made," essentially selling all of its assets and giving all of the

---

[24] For example, the February 2000 board meeting minutes from Grundy's board meeting reflected that Grundy was negotiating a purchase contract with Smith Oil Company on behalf of Midwest Propane. (Docket No. 42-7.) The November 2003 board meeting minutes from Grundy's board meeting reflected that Grundy was receiving quotations to renew liability insurance coverage for Grundy and Midwest. (Docket No. 42-6.)

[25] While admittedly the record does not demonstrate that Grundy exercised a high degree of control over Midwest's *day-to-day* decisions, it is clear they did exercise a high degree of control over their general operations—particularly the more significant decisions. Accordingly, this factor is at the very least slightly in favor of finding domination and a lack of corporate separateness.

proceeds to Grundy. *Louisville/Jefferson Cnty. Metro Gov't v. Hornblower Marine Servs.-Kentucky, Inc.*, 3:06-CV-348-S, 2009 WL 3231293, at *7 (W.D. Ky. Oct. 2, 2009).[26] As a result, the Court finds that there was sufficient domination of Midwest to merit a finding of a lack of corporate separateness.

In making this finding, the Court notes that two of the three "critical" factors are in favor of such a finding. Furthermore, a majority of all of the factors are in favor of this finding. However, this finding alone is not determinative as to whether a corporate veil piercing or alter ego determination is appropriate as it only demonstrates the first element has been shown. The second element—whether circumstances exist under which continued recognition of the corporation would sanction a fraud or promote injustice—is also required.

IV. Second Element – Circumstances Under Which Continued Recognition of the Corporation Would Sanction Fraud or Promote Injustice

With respect to the second element, the Kentucky Supreme Court in *Inter-Tel* adopted the analysis from the Seventh Circuit in *Sea-Land Services, Inc. v. Pepper Source*, 941 F.2d 519 (7th Cir. 1991):

> The examples identified in *Sea–Land* are illustrative of schemes and circumstances that, while not constituting fraud, merit piercing where there is also evidence that the debtor corporation has lost its separate identity. There are other scenarios which also qualify, as reflected in any survey of veil-piercing cases. Thus, to the extent *White* can be read to require evidence of actual fraud before an

---

[26] The Court notes the notion that because Plaintiffs contracted with Defendants for a complete sale of Midwest's assets they should have known Midwest would subsequently dissolve and/or they had the option of asking Grundy/Innovative for an individual guaranty to secure these agreements does not preclude piercing of the corporate veil. *See generally Schultz v. Gen. Elec. Healthcare Fin. Servs. Inc.*, 360 S.W.3d 171, 173 (Ky. 2012).

entity's veil is pierced, it is overruled. We agree with the Seventh
Circuit, however, that **the injustice must be something beyond
the mere inability to collect a debt from the corporation.**

*Inter-Tel,* 360 S.W.3d 152, 164-65 (Ky. 2012) (emphasis added).  Specifically, with

respect to what would "promote an injustice" the Seventh Circuit in *Sea-Land* stated:

> The prospect of an unsatisfied judgment looms in every veil-
> piercing action; why else would a plaintiff bring such an action?
> Thus, if an unsatisfied judgment is enough for the "promote
> injustice" feature of the test, then *every* plaintiff will pass on that
> score, and *Van Dorn* collapses into a one-step "unity of interest
> and ownership" test.
> Because we cannot abide such a result, we will undertake our own
> review of Illinois cases to determine how the "promote injustice"
> feature of the veil-piercing inquiry has been interpreted.
>           * * *
> Generalizing from these cases, we see that the courts that properly
> have pierced corporate veils to avoid "promoting injustice" have
> found that, unless it did so, **some "wrong" beyond a creditor's
> inability to collect would result**: the common sense rules of
> adverse possession would be undermined; former partners would
> be permitted to skirt the legal rules concerning monetary
> obligations; a party would be unjustly enriched; **a parent
> corporation that caused a sub's liabilities and its inability to
> pay for them would escape those liabilities**; or an intentional
> scheme to **squirrel assets into a liability-free corporation while
> heaping liabilities upon an asset-free corporation would be
> successful**.

*Sea-Land*, 941 F.2d 519, 522-24 (7th Cir. 1991) (emphasis added).

      The Court agrees with Plaintiffs that the failure to exercise jurisdiction over

Innovative and Grundy would at the very least promote an injustice—this situation

involves more than "the mere inability to collect a debt from a corporation."  *Inter-Tel,*

360 S.W.3d 152, 165 (Ky. 2012).  As demonstrated above, Grundy had the ability to

exercise total control over Midwest.  Since Midwest sold all of its assets, pursuant to the

1999 Amended Operating Agreement, such action would have required the "advice and consent" of Grundy's board of directors.[27]

Plaintiffs have alleged fraud and breach of contract with respect to the asset purchase. The proceeds of this purchase were transferred to Grundy for nothing in return, leaving Midwest without any assets. Therefore, assuming Plaintiff is able to prevail on these claims, a parent corporation that caused a subsidiary's liabilities and its inability to pay for them would escape those liabilities and/or there arguably exists an intentional scheme to squirrel assets into a liability-free corporation while heaping liabilities upon an asset-free corporation would be successful. *Sea-Land*, 941 F.2d 519, 522-24 (7th Cir. 1991). As a result, Plaintiff's claims involve more than "the mere inability to collect a debt from a corporation." *Inter-Tel,* 360 S.W.3d 152, 165 (Ky. 2012). Accordingly, the Court finds circumstances exist under which continued recognition of the corporation would sanction fraud or promote injustice.

Defendants argue that the fact the "sale proceeds benefitted Grundy Electric" is merely a red herring. (Docket No. 44, Page 12.) In support, Defendants assert that Scott Wilson's testimony and answer to interrogatory number six establish that the proceeds from the APA were booked separately and are still being used to make payments on Midwest Propane's loan at CoBank lender.[28] (Docket No. 33-6, Page 48; 47-3, Page 4-5.) The Court disagrees that there is merely a "red herring." On the contrary, along with Grundy's ability to completely control Midwest it shows that such

---

[27] Even casting the 1999 Amended Operating Agreement aside, such action would have at the very least required the consent of Innovative's ownership group, which is made up of the same individuals constituting Grundy's board of directors.

[28] In a completely different set of motions Defendants have alleged the amount of the debt which remained after the Asset Purchase Agreement was over 2 million dollars. (Docket No. 45, Page 6.)

undue control was exerted.  The assertion that the proceeds were booked separately does not change the fact Midwest received nothing in return for these proceeds as Grundy was already a guarantor on the loan now allegedly being paid back.[29]

## CONCLUSION

Having found the two elements met, the Court finds that Midwest is the "alter ego" of Grundy and Innovative and/or will pierce the corporate veil of Grundy/Innovative.  Accordingly, the Court does not lack person jurisdiction over Defendants Grundy and Innovative.  The Court will **DENY** Defendants' Motion to Dismiss due to lack of personal jurisdiction as to Grundy and Innovative.

IT IS SO ORDERED.

Date:


cc:      Counsel

---

[29] As a sidenote, the Court notes that had Midwest dissolved while still in possession of the proceeds tentatively Innovative/Grundy would have been entitled to the proceeds.  However, it appears that unpaid creditors of the corporation may have nonetheless been entitled to recover the proceeds from Innovative/Grundy because "the general rule holds that that if a shareholder receives property from a dissolved corporation, that shareholder is liable to any unpaid creditors of the dissolved corporation to the extent of the property received."  *Bear, Inc. v. Smith*, 303 S.W.3d 137, 146 (Ky. Ct. App. 2010); *see also* Thomas E. Rutledge, *The 2007 Amendments to the Kentucky Business Entity Statutes*, 97 Ky. L.J. 229, 239 (2009) (stating "corporate shareholders may be personally liable for debts and obligations of a corporation incurred after administrative dissolution. As the language of the statute in question is nearly identical to the language in the LLC Act, this ruling is in all likelihood equally applicable to LLCs.").  It would be illogical for a different result to occur merely because Midwest transferred the proceeds *before* dissolution.